NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KEVIN McGUINNESS, | **Civil Action No. 18-12861 (SRC)** |
| Plaintiff, | **OPINION** |
| v. | |
| SILGAN CONTAINERS, et al., | |
| Defendants. | |

**CHESLER**, District Judge

 This matter comes before the Court on the motion for summary judgment filed by Defendant Silgan Containers Manufacturing Corporation ("Defendant" or "Silgan"), pursuant to Federal Rule of Civil Procedure 56.[1] Plaintiff Kevin McGuinness ("Plaintiff" or "McGuinness") opposes the motion. The Court has reviewed the papers submitted and proceeds to rule without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, Defendant's motion for summary judgment will be denied.

## I. BACKGROUND

 This is an employment discrimination action. Plaintiff McGuinness had been employed as a production supervisor for Defendant Silgan. Silgan develops and manufactures metallic

---

[1] As Silgan notes in its brief, it is the sole Defendant in this case. The action was originally filed against various parties identified as "Silgan Containers, Silgan Containers Corporation, Silgan Containers LLC, and Silgan Holdings Inc." Thereafter, by stipulation, all of these entities were dismissed from the case. See December 11, 2018 Order.

containers for food products. In connection with this business, Silgan maintains a 100,000 square foot production facility in Edison, New Jersey (the "Edison facility").

McGuinness was terminated from employment on February 6, 2018. He claims that the termination was motivated by Silgan's discrimination against him on the basis of his disability and also in retaliation for his disability-related leaves of absence. Silgan, however, maintains that it terminated McGuinness due to his unsatisfactory job performance, specifically, his failure to address subordinate employees' misuse of break time. The following synopsis sets forth facts relevant to this motion.

### A.  Plaintiff's Role at the Edison Facility

McGuinness began working at Silgan in October 2014. He was hired as a management trainee. In or about January 2016, McGuinness was promoted to the position of production supervisor. Plaintiff worked at the Edison facility during his entire tenure.

Silgan's Edison facility operates as follows: The production schedule is divided into two twelve-hour shifts, running from 6 a.m. to 6 p.m. and 6 p.m. to 6 a.m. Silgan operates with four different crews, of approximately 20 to 25 employees per crew. The A and B crews work the day shift, and the C and D crews work the night shift. The crews alternate their respective shifts, working a schedule of four days on and four days off. Each crew has two supervisors.

At the time relevant to this suit, McGuinness was assigned to supervise the night shift's D crew, together with Rob Paprota, a more experienced supervisor. The other night shift crew, that is, the C crew, was supervised by Edward Mulligan and Joseph Balleau. Production supervisors reported to Chip Miklavcic, superintendent of the Edison facility, who in turn reported to Edison facility manager Bryce Bedford.

As a production supervisor, McGuinness was a salaried employee. According to the job description proffered in the record, a production supervisor is expected to "lead and direct hourly employees with day instructions to meet production goals and line efficiencies." (Anders Decl., Ex. K.) The description identifies five essential job functions of a Silgan production supervisor: (1) maintain active involvement in employee safety and ensure an overall safe workplace; (2) adhere to quality standards; (3) lead the manufacturing unit in standard operating procedures; (4) employ effective communication skills to direct work assignments in compliance with the collective bargaining agreement; and (5) operate in a manner conducive to achieving continuous improvement using the principles of lean manufacturing.

McGuinness received a mixed review after his first year as a production supervisor. As to the essential functions, his January 2017 review noted that he met all the requirements for safety and quality and most of the requirements for continuous improvement. He did not, however, meet the leadership objective. The review noted that "Kevin needs to improve his ability to understand issues throughout the shift and make decisions to improve these issues . . . Throughout this year, Kevin has been given feedback and has made improvements and will look for this to continue." (Anders Decl., Ex. P at D-0051.) The overall assessment noted that he was in the category of "progressing" (with the other two categories being "significant deficiencies" and "promotable"). Id.

**B.  Plaintiff's Medical Leave of Absence**

In July 2017, McGuinness, then 45 years old, became seriously ill with kidney disease. Both of his kidneys were blocked, and he had to be hospitalized. Effective July 25, 2017, Silgan placed McGuinness on short-term disability and approved his leave of absence under the Family

and Medical Leave Act ("FMLA"). McGuinness remained on continuous leave from July until November 6, 2017.

During this period of leave, McGuinness' health condition worsened. In early September, he was admitted to JFK Medical Center and diagnosed with complete kidney failure. Following surgery and dialysis, his condition improved to Stage 4 kidney failure. Shortly thereafter, McGuinness was discharged from hospital care but advised that he would require dialysis and eventually a kidney transplant. He continued to recuperate at home.

McGuinness was cleared by his doctor to return to work as of November 6, 2017 but with restrictions. The doctor noted that it was "medically advised" that McGuinness be scheduled for "maximum 4 day work week x 3 months to continue management of medical conditions." (Schalk Decl., Ex. B at D-0247.) Nevertheless, when McGuinness returned to work at Silgan, the company's doctor cleared him to return to work on full duty, with no conditions or restrictions. In his declaration submitted in opposition to the motion for summary judgment, McGuinness asserts that Silgan scheduled him for six-day work weeks, exceeding the limitations advised by McGuinness's physician and exceeding the four-day work weeks he had been assigned prior to his medical leave.

On November 8, 2017, during his third shift upon returning to work, McGuinness began to experience extreme pain and blood in his urine. He left work and immediately sought treatment at JFK Medical Center. This incident required McGuinness to request a second leave of absence from work under the FMLA, which Silgan granted. McGuinness underwent same-day surgical procedures under general anesthesia on November 10 and November 17. He was cleared by his urologist to return to work on November 22, 2017, again with restrictions. The urologist stated that McGuinness should be placed on "light duty and not be able to lift anything over five

4

pounds" for the remainder of the week. (Schalk Decl., Ex. G at D-0148). Again, upon McGuinness's return to work, Silgan's company doctor placed no limitations or conditions on the tasks McGuinness should be expected to perform. McGuinness testified at his deposition that at some point thereafter, he began to inquire with Silgan's human resources department about the possibility of taking long-term disability.

The next event of any consequence in McGuinness's employment occurred approximately seven weeks later, on January 12, 2018. On that date, he was called in for a meeting with management and human resources staff to discuss a problem involving break time violations at the Edison facility. The details of this meeting will be set forth in more detail below.

### C.  The Break Time Investigation

At some time in the late summer or early fall of 2017, Edison facility manager Bryce Bedford "started believing that our people on our night shift were not doing their job" and decided to launch an investigation into the problem. (Bedford Dep. 28:24-29:1.) As facility manager, Bedford is on the Silgan premises mainly during the day shift. He began to suspect that the night shift employees were spending long amounts of time away from production lines based, in his own words, on the following information:

> We started having issues with our night crew where we would come in on day shift, there would be a lot of problems. Our day shift would work to solve the problems, fix the machines machines [sic] and when we would leave the day shift, the plant would be running well. We would come back in the next day and we would be in a similar situation where we had a lot of problems, and it was repeating itself.

> We had employers tell our warehouse supervisor, he said he was going to come in at night. He says if you come in at night, you are not going to find anybody because there's people outside leaving the plant.

> Around that same time I actually happened to be in on the night shift and I saw a car drive by my office and then it happened a half hour, 45 minutes later, it came back.

When I checked, we have a log that people are supposed to log out and punch in or punch out or punch back in, and no one did that.

So there was a bunch of different things that kind of made me believe we had an issue on the day night shift.

(Id. at 29:14 - 30:12.)

Bedford therefore determined that it was necessary to hire a private investigator to conduct surveillance in connection with the Edison facility employees' possible misuse of Silgan break policy. According to Bedford's description of the policy at the time, employees were permitted to take one thirty-minute lunch break and three fifteen-minute breaks over the course of their twelve-hour shifts. Breaks could be taken back-to-back but only if an employee obtained permission from his or her supervisor. Additionally, an employee was permitted to leave the premises on his or her break after notifying the supervisor, punching out on the time clock before leaving, and punching back in after returning. Breaks at the Edison facility could be taken in a number of locations, including a break room and the parking lot.

Around the same time that Bedford noticed that employees might be abusing the company break policy, Rob Paprota, co-supervisor of the night shift's D crew, brought the excessive break time issue to the attention of both Bedford and Paprota's immediate superior, Chip Miklavcic. According to Bedford, Paprota "told me one time, and I know that he talked to Chip and went to see him another time." (Id. at 79:22-24.) Bedford recalls the following details of his conversation with Paprota about the employee break time issue:

Q       What does Rob say?

A       To me, actually my conversation with him was that we were going to have a meeting with the president of the union and chairman of the grievance committee about other things. Not this situation.

6

> He mentioned to me, he said something to the effect you should talk to him about the break times. Break times are getting out of control again.
>
> Q     Okay.
>
> A     I got information and he basically says, I've talked to him, I talked to certain employees, but they continue to take longer breaks than necessary, and we need their help to get this back into check.

(Id. at 80:18-81:7.) Bedford also recalled that Paprota said something to him "right around that same time" that the decision to hire an investigator was made but that "[i]t wasn't part of the reason why I got ahold of the private investigator." (Id. at 80:9-11.)

Similarly, Miklavcic stated that, at about the time of the investigation, Paprota informed him of the employee break problem, but also confirmed that Paprota was not made privy to the investigation. Miklavcic testified as follows:

> Q     How is it that three of the four supervisors on C and D are terminated but not the fourth?
>
> A     I believe Rob came to us either right before or during the investigation and saying that he was aware that employees were taking long breaks.
>
> Q     You say he came to you or you mean – you said us, I think.
>
> A     I think he said it during a meeting one day.
>
> Q     Is this what led you to bring the investigator in?
>
> A     No. I think it was already in play. I think the investigation was ongoing at that point.
>
> Q     So he's telling you after the investigation is ongoing that people are taking long breaks.
>
> A     I believe so.
>
> Q     Why would he do that, if you know?
>
> A     I don't know.

> Q      Did you say something like we're already investigating this?
>
> A      No, I did not.
>
> Q      So you pretended you didn't know or you didn't let him know there was an investigation ongoing?
>
> A      Right.

(Miklavcic Dep. 78:17-79:15.)

The break time investigation commenced in or about September or October 2017. Private investigator Anthony Meola, hired by Bedford, conducted surveillance of employee activity in the Edison facility's parking lot. Throughout the course of the investigation, Meola turned over his surveillance videos to Bedford and Miklavcic, who then reviewed the tapes to identify the employees depicted. Further investigation by Miklavcic using the surveillance reports revealed that some night shift employees were spending excessive amounts of time in the parking lot of the Edison facility or were even leaving the Silgan premises altogether, apparently without permission and/or without punching out.

On November 4, 2017, Bedford reported this information in an email to his superior, Silgan area manager Dean LaClair, with a copy to Miklavcic. The email, with the subject line "PI surveillance results on night crew" reads as follows:

> Dean
>
> As expect we are out of control on nights with excess breaks and employees out in their cars more than they should be.
>
> We have 4-6 people that are extreme as far as breaks and leaving the plant
>
> - Close to 1 hours breaks
> - Sleeping in car
> - Leaving property sometimes multiple times in in a shift

> We have identified 4 employees and the PI says there are a few more he hasn't gotten identified.
>
> I would like to set up a call with me you and Chip to discuss the next steps.
>
> Bryce

(Schalk Cert., Ex. G at D-0089.) The surveillance and investigation continued throughout the month of November and into December. It is not clear from the record on exactly which date the surveillance concluded or the reason for ceasing surveillance in or about the middle of December.

On December 16, 2017, Miklavcic prepared a summary report of the investigation's findings and sent it via email to Bedford, LaClair, and two members of Silgan's human resources staff, Cara Winslow and Sharon Drumetski. It stated that on numerous dates throughout the investigatory time frame, ten different employees had violated Silgan's break policy by taking breaks that exceeded the authorized amount of time, by failing to punch out for their breaks and/or by leaving the Silgan premises without permission to do so. The summary report identified the employees and provided details on the date and nature of the infractions. All of the employees observed abusing the break time policy were on either the C or D crew, Silgan's two night shift crews. Of the various dates on which D crew violations were observed, McGuinness was on duty for two, which occurred after his return to work from disability leave. On November 25, 2017, five employees were observed taking unauthorized breaks, and on December 11, 2017, those same five employees again abused the break policy.

### D.  The January 12, 2018 Meeting

Thereafter, the hourly employees involved in the break time misconduct and the four supervisors of the C and D crews were called for individual questioning as part of the

investigation. The meetings involved Bedford, Miklavcic, Drumetski and Winslow (the latter participating by telephone). They met with McGuinness on January 12, 2018.

According to Silgan's brief, McGuinness admitted at the meeting that he knew employees were abusing the company's break policy and further admitted that he did not take the appropriate responsive action. Silgan points to deposition testimony in which McGuinness acknowledged telling management he was suspicious that certain employees were taking longer breaks than they should but that he did not definitively determine whether a break time violation had occurred. (McGuinness Dep. at 50-51.) Silgan also points to McGuinness' testimony recalling that, at the meeting, "I think I told Bryce that I guess I have to do a better job." (Id. at 126:15-17.)

McGuinness maintains that he acknowledged excessive break time was a problem at the Edison facility but also made it clear that he had no idea of the extent of the problem. He testified as follows:

> Q    Do you recall telling Mr. Bedford that you saw people taking longer breaks than allowed but not—
>
> A     I admitted it was a problem at the plant. I was not aware of people leaving the plant. I saw that was written down and that was not true. I was not aware people were leaving the plant and not punching out. Anybody that did request to leave the plant were always told to punch out. Anything that happens while you're out and you're still on the clock, Silgan would basically be responsible.
>
> Q    During that investigation, did you tell management that you knew people were taking breaks for longer than allowed?
>
> A    Yes.
>
> Q    I think you mentioned that.
>
> A    But not specifically. I couldn't tell you if a specific person was taking a long break. I was suspicious.

(Id. at 49:21 - 50:12.) Later in the deposition, McGuinness elaborated on his knowledge

of the break time abuses and his handling of the situation. During questioning about the

minutes of the January 12 meeting, the following exchange took place:

> Q    Do you recall telling Mr. Bedford that you saw people taking
>      longer breaks than allowed but not—
>
> A    Not in those exact words. That statement is misleading in context.
>      What was meant by that was there's a few things in here that I
>      knew people were taking longer breaks, not that they had my
>      permission, but oftentimes when I found something and suspected
>      they were taking longer breaks, they usually stated I just got here
>      or I just started my break.
>
>                                    ***
>
> Q    As supervisor did you do anything to attempt to control the breaks
>      that people were taking?
>
> A    I've gone out and gotten people. I told them get back inside. Your
>      break is over. I've also done that on day shift as well.

(Id. at 124:19-125:4, 125:10-15.)

The minutes of the January 12 meeting, recorded by Drumetski, document the discussion

regarding McGuinness's awareness of excessive break periods and his attempts to handle the

problem. According to the minutes, McGuinness explained that he has had to go out and look for

people he noticed were away from production lines. He also stated that he confronted a certain

employee, who would often take long breaks, but that this employee would claim his break had

just begun. The notes reflect that the meeting appears to have concluded with Bedford's

counseling McGuinness that going forward, this misconduct would be considered a theft of time

and a safety violation.

11

### E.  Termination of Night Shift Supervisors

Silgan management and human resources reviewed all of the facts developed in the investigation, including the information gathered at the individual meetings, as well as the performance and disciplinary history of each employee involved in the break time violations. They discussed the appropriate discipline to mete out for each person's misconduct. Ultimately, Silgan decided to terminate three of the four night shift supervisors, including McGuinness.

The C Crew supervisors, Balleau and Mulligan, were both terminated. According to Bedford, Balleau was terminated because he knew nothing about the long breaks and people leaving the plant multiple times and Silgan considered this complete lack of awareness "extreme poor performance" by a supervisor. (Bedford Dep. 86:2-16.) Mulligan was terminated for "basic incompetence" because "he knew that the problem was going on and actually defended the people that were taking these long breaks." (Id. 86:18-87:2.)

As to the D Crew, Bedford made the decision to terminate McGuinness because he did not handle the break time situation in the appropriate manner. Bedford elaborated on Silgan's expectations of a manager faced with a subordinate's misconduct with regard to break times. He stated that supervisors should be aware of the kind of repeated violations revealed in the investigation and should take action, specifically the following:

> You need to confront the person, you need to change the behavior. If people were taking long breaks, it is one of your main jobs to manage your people, to coach this person, to inform this person and tell him what your expectations are . . . If you don't know how to do that, then ask for help.

(Id. at 71:18-72:2.) Bedford emphasized that the failure by McGuinness to confront the employees or inform management of the situation and ask for help "was the main component of why we made our decision." (Id. at 85:16-20.) As to the "key point" for McGuinness' termination, Bedford testified as follows:

> He [McGuinness] knew this thing was going on and [he] didn't
> talk to anybody. He didn't ask. [McGuinness] didn't talk to [his] partner
> about it. [He] let these guys keep doing what they were doing.
>
> That was the reason he was terminated. It had nothing to do with
> his medical condition, leave, when he was off, when he was on. It was that
> he knew [and] he didn't do anything. He didn't ask for help from anybody,
> and that's not what a manager does.

(Id. at 179:12-23.) Both Bedford and Winslow added that McGuinness' performance record, in particular, his management and leadership issues, factored into the determination to terminate his employment.

The only supervisor not terminated was Rob Paprota, who supervised the D crew alongside McGuinness. According to Silgan, Paprota was different than the others because he was aware of the employee misconduct and took the appropriate action to handle the situation. Bedford distinguished Paprota from McGuinness as follows: "Well, Rob, he did know there was long breaks. He did talk to management and he did talk to some of his employees. So he did do something about it." (Id. at 83:19-22.) Likewise, Winslow testified that although Paprota worked the same night shift and supervised the same D crew as McGuinness, "Rob was actively trying to catch them. . . And he is speaking to Bryce—Mr. Bedford about it. He is expressing his concern that he believes this is going on. And then we have this supervisor saying that he found people in the parking lot. He doesn't say anything." (Winslow Dep. 58:1-10.)

### F.  Plaintiff's Termination

Plaintiff was informed of his termination, effective immediately, by letter of February 6, 2018. The letter advised that the employment action was considered a "Poor Performance Termination" and as such McGuinness was eligible for three weeks' severance pay. (Anders

Decl., Ex. I.) It further advised that such severance would be made available within ten business days, following a revocation period, provided that McGuinness signed a "Confidential Separation Agreement and General Release of All Claims." (Id.) McGuinness did not sign the agreement.

### G.  Plaintiff's Lawsuit

Plaintiff filed suit against Silgan in the Superior Court of New Jersey, Law Division, Middlesex County on July 16, 2018. The Complaint asserts two claims for relief: a claim for violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1, et seq., and a claim for violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. Silgan removed the action to federal court on August 16, 2018.

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.


## II.   DISCUSSION

### A.  Legal Standard

Federal Rule of Civil Procedure 56(a) sets the standard the Court must apply to the parties' cross-motions for summary judgment. Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). It is well-established that a factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and material if, under the substantive law, the dispute would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for

summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). It may not make credibility determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the nonmoving party must establish the existence of a genuine issue as to a material fact in order to defeat the motion. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). To create a genuine issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial. Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014). The party opposing a motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### B. NJLAD Claim for Discriminatory Termination

McGuinness claims that he was terminated from his job at Silgan due to his chronic kidney disease and resulting physical disability. He seeks redress under the NJLAD, which, in relevant part, makes various forms of discriminatory employment practices unlawful, including termination on the basis of disability. See N.J.S.A. § 10:5-4. The New Jersey Supreme Court encourages an expansive approach to the statute, holding that "the overarching goal of the LAD

to eliminate the cancer of discrimination is to be achieved through a liberal construction of its provisions." Viscik v. Fowler Equip. Co., 173 N.J. 1, 13 (2002).

To evaluate an employment discrimination claim under the NJLAD, New Jersey courts have adopted the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Viscik, 173 N.J. at 13-14; see also Victor v. State, 203 N.J. 383, 408 (2010) (citing various New Jersey Supreme Court cases which embrace the "McDonnell Douglas burden-shifting paradigm" and proceeding to apply it the plaintiff's NJLAD claim for employment discrimination based on a failure to accommodate his disability). McDonnell Douglas provides an analytical framework consisting of three parts: First, a plaintiff must demonstrate that he or she can establish a prima facie case of employment discrimination. McDonnell Douglas, 411 U.S. at 802; Viscik, 173 N.J. at 14; Victor, 203 N.J. at 408. If the plaintiff can meet the elements of a prima facie claim, a presumption of unlawful discrimination by the employer arises. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492-93 (1982). Next, to rebut the presumption, the employer must come forward with "a legitimate, non-discriminatory reason for the adverse employment action." Viscik, 173 N.J. at 14; see also McDonnell Douglas, 411 U.S. at 802. The employer may satisfy this burden by introducing evidence which, taken as true, would allow the factfinder to conclude that there was a nondiscriminatory reason for the unfavorable employment decision. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993). The employer need not prove, however, that the tendered reason actually motivated the decision. Burdine, 450 U.S. at 254-55. The burden remains on the plaintiff to demonstrate that he or she has been the victim of intentional discrimination. Id. at 256. Lastly, if the employer carries the burden of producing evidence of a legitimate reason for the employment action, "the burden shifts back to the plaintiff

to show that the employer's proffered reason was merely a pretext for discrimination."
Viscik,173 N.J. at 14; McDonnell Douglas, 411 U.S. at 802. The New Jersey Supreme Court has
held that "under the McDonnell Douglas framework, a plaintiff retains the ultimate burden of
persuasion at all times; only the burden of production shifts." Viscik, 173 N.J. at 14 (citing
Andersen, 89 N.J. at 493); see also Burdine, 450 U.S. at 256 (holding same).

In this case, the first two steps of the McDonnell Douglas analysis are easily satisfied, for
purposes of assessing whether Defendant is entitled to summary judgment on the NJLAD claim.

When, as in this case, the NJLAD claim is based upon discriminatory discharge, the
plaintiff must demonstrate the following elements of a prima facie claim: (1) that plaintiff is
disabled; (2) that plaintiff was otherwise qualified to perform the essential functions of the job;
(3) that plaintiff suffered an adverse employment action; and (4) that the adverse employment
action occurred under circumstances giving rise to an inference of discrimination. Clowes v.
Terminix Int'l, Inc., 109 N.J. 575, 596–97 (1988); Muller v. Exxon Research & Eng'g Co., 345
N.J. Super. 595, 602-03 (App. Div. 2001). Although Silgan has argued that McGuinness cannot
establish a prima facie case of discrimination, the New Jersey Supreme Court has described the
plaintiff's threshold burden on an employment discrimination claim as "'rather modest: it is to
demonstrate that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that
discrimination could be a reason for the employer's action.'" Zive v. Stanley Roberts, Inc., 182
N.J. 436, 447 (2005) (quoting Marzano v. Computer Sci. Corp., 91 F.3d 497, 508 (3d Cir.
1996)).

The Court finds that McGuinness has proffered sufficient evidence upon which a
reasonable jury could find that each element of his NJLAD claim is satisfied. Plaintiff suffered
from a physical disability related to his compromised kidney function, a fact which Defendant

17

does not dispute. The Court finds that Plaintiff has proffered sufficient evidence for a jury to find that he was adequately performing the essential functions of his job as production supervisor. While Silgan maintains that McGuinness was an average to below average supervisor, Plaintiff's 2017 annual review notes satisfactory performance in a number of areas. There is no indication that Plaintiff's record was tarnished with disciplinary issues or that he had been warned by Silgan that his performance placed him in danger of termination. To the extent Silgan argues that McGuinness' conduct as supervisor was deficient for failure to monitor break times, this point relates to Silgan's proffered justification for the termination, that is, part two of the McDonnell Douglas analysis. As to the third element, clearly, McGuinness clearly suffered an adverse employment action when he was terminated from his job. Lastly, the circumstances of the termination can be seen by a factfinder as indicating that McGuinness was fired due to his disability. The termination occurred roughly two months after he returned to work from a lengthy leave of absence due to repeated hospitalizations and treatments for his serious kidney failure. There is evidence that medically advised accommodations for Plaintiff's condition were not made by Silgan. Moreover, the record shows that another production supervisor who, like Plaintiff, supervised the D crew, was not terminated. In spite of Silgan's argument that the other supervisor is not an apt comparator, the proffered evidence allows Plaintiff to meet the modest burden of establishing a prima facie claim on this motion.

The second part of the McDonnell Douglas analytical framework has been satisfied by Defendant for purposes of this motion for summary judgment. Silgan has proffered evidence that it terminated Plaintiff, not because of his disability, but because he had failed to properly supervise his production crew and address the break time misconduct by certain employees. It is undisputed that break time violations occurred on two dates on which McGuinness was

supervising the D crew. Silgan has thus articulated a legitimate, non-discriminatory reason for its decision to terminate Plaintiff's employment. The burden, then, shifts back to Plaintiff to demonstrate that this reason is pretextual.

The focus of the summary judgment motion before the Court indeed rests on the third part of the McDonnell Douglas analysis. At this stage, the burden is on the plaintiff to show that the employer's stated reason for the adverse employment action was merely pretext. Zive, 182 N.J. at 449. In other words, the plaintiff must "demonstrate that the employer was motivated by discriminatory intent." Id. A plaintiff may defeat summary judgment on an employment discrimination claim if:

> he or she can point to some evidence, direct or circumstantial, from which a factfinder counsel reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Zive, 182 N.J. at 455-56 (quoting Fuentes v Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). To discredit a defendant's proffered, non-discriminatory reason for its employment decision, a plaintiff "cannot simply show that [the employer's] decision was wrong or mistaken but must demonstrate such weaknesses, implausibilities, inconsistencies or contradictions in its proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence' and hence infer that the employer was not actually motivated by it proffered nondiscriminatory reason." Fuentes, 32 F.3d at 765; Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 347-48 (App. Div. 1997).

Plaintiff points to abundant evidence in the record which could cause a factfinder to doubt Silgan's articulated reason for terminating Plaintiff's employment. Although Silgan claims that the termination was due to Plaintiff's "deficient performance surrounding the employee

break issue" (Def. Reply at 9) and points to the uncontroverted fact that employee break violations occurred on two shifts supervised by Plaintiff, the record also demonstrates that Plaintiff was out on disability leave for almost the entire time period in which the employee break issue was under investigation. Indeed, it was first identified as a potential problem by Edison facility manager Bedford in the "late summer or early fall" of 2017. Plaintiff, however, went out on disability leave on July 25, 2017 and remained on continuous leave from that date until November 6, 2017, returning to work for only three days before going out again until November 22, 2017. Plaintiff was absent when the issue prompted management to hire an investigator and he was absent when the investigator had provided enough damaging surveillance-based information for Bedford to escalate the issue to his supervisor in a November 4, 2017 email emphasizing the severity of the problem. The record indicates that the break time problem mounted to a critical level during the roughly four-month time period of Plaintiff's disability leave of absence. In light of the foregoing evidence, while the record does demonstrate that employees were observed taking long breaks on Plaintiff's November 25 and December 11, 2017 shifts, a jury could reasonably disbelieve Silgan's claim that Plaintiff's conduct on these two dates was the true reason Silgan terminated him.

Added to this is the record evidence indicating that during the many months Plaintiff was on leave, the other D crew supervisor, Paprota, was in charge on various other dates that employees were observed abusing the break time policy, including leaving the Silgan premises without permission. Yet, Paprota was not terminated. Defendant has argued that Paprota's comment to Bedford that he should talk to the labor union about employee break times demonstrates that Paprota took the appropriate action, but it is clear from the record that the problem had already been detected by Bedford himself, who made the determination that an

investigation was needed before Paprota even made this comment. Moreover, Bedford testified that he expected a supervisor to confront employees abusing break times, write them up for violations, and go to management for help if the supervisor was unable on his own to stop the misconduct. There is no indication, however, that Paprota took these actions as abuses continued throughout the fall of 2017, as documented by the investigation. Defendant also argues that the different outcomes of the break time investigation for the two D crew supervisors cannot be compared because, unlike McGuinness, Paprota "actively tried to catch employees abusing the break policy and then affirmatively sought the assistance of management." (Def. Br. at 10.) However, no evidence has been proffered to support Silgan's claim Paprota was an active participant in dealing with break time offenders. Indeed, both Bedford and Miklavcic confirmed that they did not make Paprota aware that investigatory surveillance to catch offenders was in progress. In sum, Plaintiff raises sufficient evidence to create a genuine issue of fact on the matter of pretext. Considering all the circumstances, a trier of fact could disbelieve Silgan's articulated reason for its decision to terminate Plaintiff.

Based on the foregoing facts in the record and viewing the evidence as a whole and in the light most favorable to Plaintiff, the Court concludes that there are genuine issues of material fact regarding the motivation for Silgan's termination of Plaintiff's employment. Accordingly, Defendant has not demonstrated that it is entitled to summary judgment on Plaintiff's disability discrimination claim under the NJLAD.

### C. Family and Medical Leave Act Retaliation Claim

McGuinness claims that Silgan terminated his employment in retaliation for exercising

his right under the FMLA to take a leave of absence to deal with his medical condition. The

FMLA provides, among other things, that certain employees may "take reasonable leave for

medical reasons." 29 U.S.C. § 2601(b)(2). In relevant part, it entitles eligible employees "to a

total of 12 workweeks of leave during an 12-month period . . . because of a serious health

condition that makes the employee unable to perform the functions of the position of such

employee." 29 U.S.C. § 2612(a)(1)(C). The FMLA prohibits an employer from taking an adverse

employment action against the employee in retaliation for his or her use of FMLA leave.

Victorelli v. Shadyside Hosp., 128 F.3d 184, 190 (3d Cir. 1997).

An FMLA retaliation claim is subject to the same three-part McDonnell Douglas analysis

applied in other employment discrimination contexts, as set forth above in the Court's discussion

of the NJLAD claim. Parker v. Hanhemann Univ. Hosp., 234 F. Supp. 2d 478, 488 (D.N.J.

2002). As a threshold matter, Plaintiff must establish his prima facie retaliation claim, which

requires him to demonstrate that (1) he took FMLA leave, (2) he suffered an adverse

employment action, and (3) the adverse action was causally related to the leave. Conoshenti v.

Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004), holding modified by Erdman v.

Nationwide Ins. Co., 582 F.3d 500 (3d Cir. 2009); Parker, 234 F. Supp. 2d at 488. A causal

connection can be inferred from circumstantial evidence. Farrell v. Planters Lifesavers Co., 206

F.3d 271, 280-81 (3d Cir. 2000); Parker, 234 F. Supp. 2d at 492 n.15. This evidence can include

temporal proximity between the leave and adverse action, ongoing antagonism by the defendant,

and other circumstances, which, when viewed as a whole, can give rise to an inference of

22

causation. <u>Farrell</u>, 206 F.3d 280-81; <u>Parker</u>, 234 F. Supp. 2d at 492. Once McGuinness sets forth a prima facie claim, Silgan must come forward with evidence that it would have taken the same action for nondiscriminatory reasons. <u>Conoshenti</u>, 364 F.3d at 147; <u>Parker</u>, 234 F. Supp. 2d at 493. Lastly, the burden shifts backs to Plaintiff to demonstrate that the employer's proffered reason is pretextual. <u>Id.</u>

For similar reasons as discussed above, the Court finds that there are genuine disputes of material fact concerning whether McGuinness was terminated from employment at Silgan in retaliation for taking FMLA leave. First, McGuinness has proffered sufficient evidence for a jury to conclude that he meets the elements of a prima facie FMLA retaliation claim. The record shows that McGuinness was terminated just over two months after taking a four-month FMLA leave, that workplace accommodations for Plaintiff's disability were not made by Silgan as directed by McGuinness' doctor, and that McGuinness perceived an environment that was antagonistic to employee illness. Silgan, in turn, proffers evidence of a legitimate reason to terminate Plaintiff's employment. And, for the reasons discussed, the record contains facts which indicate the kinds of weaknesses and inconsistencies in Defendant's handling of the break time situation that would allow a jury to discredit Silgan's proffered legitimate reason.

In short, McGuinness has raised triable issues of fact on his FMLA retaliation claim. Thus, summary judgment as to this claim will also be denied.

**III.    CONCLUSION**

For the reasons discussed, genuine issues of fact as to the motivation for Silgan's termination of McGuinness' employment preclude Silgan from satisfying the Rule 56(a) burden for obtaining summary judgment on Plaintiff's claims for discriminatory termination under the NJLAD and for unlawful retaliation under the FMLA. Defendant's motion for summary judgment will accordingly be denied. An appropriate Order will be filed.

____ s/ Stanley R. Chesler ____
STANLEY R. CHESLER
United States District Judge

Dated: October 13, 2020